**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STEVE HAUGHT, | : | 1:15-cv-0069 |
| on behalf of himself and similarly | : | |
| situated employees, | : | |
| | : | |
| Plaintiffs, | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| SUMMIT RESOURCES , LLC, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

### April 4, 2016

The Court is in receipt of Plaintiff Steve Haught's unopposed Motion for

Final Approval of Class and Collective Action Settlement, and Approval of

Attorneys' Fees and Costs, filed February 24, 2016.  (Doc. 51).  A fairness hearing

was held in this matter on March 15, 2016.  Based on the submissions of the

parties and the testimony at the hearing, and for the reasons that follow, the Motion

shall be granted.

## I.    FACTUAL & PROCEDURAL BACKGROUND

Plaintiff Steve Haught ("Haught") was employed by the Defendant, Summit

Resources, LLC ("Summit") as a Land Agent from August 4, 2013, until on or

about April 25, 2014.  (Doc. 1, ¶ 4).  Haught was one of approximately 300 such

Land Agents in Summit's employ.  (*Id*. ¶ 13).  According to Haught's Complaint,

Land Agents employed by Summit are typically paid a "day rate" of $325.00 but are not eligible for overtime wages or a salary. (*Id*. ¶¶ 16, 23-24, 27). They often work in excess of forty hours per week. (*Id*. ¶ 39). Haught filed a Complaint on his own behalf and on behalf of similarly situated employees in the above-captioned matter on January 9, 2015. (Doc. 1). In his Complaint, Haught alleged that Summit improperly classified its workers as exempt employees within the meaning of the Fair Labor Standards Act of 1938 (29 U.S.C. § 201 *et seq*.) and the Pennsylvania Minimum Wage Act (43 P.S. § 333.101 et seq.). (*Id*. ¶¶ 25-26, 30, 31). He sought relief in the form of judgment from this Court in his favor, damages in an amount equal to the overtime compensation due, liquidated damages, and reasonable attorneys' fees and costs. (*Id*. ¶ 94).

Summit filed an answer to the Complaint on February 27, 2015. (Doc. 8). On March 4, 2015, Haught filed an Amended Complaint, (Doc. 11), and Summit again answered on March 18, 2015. (Doc. 15). On May 14, 2015, Haught filed an opposed Motion to Certify the Class Conditionally. (Doc. 27). On July 8, 2015, a Joint Motion to Stay Proceedings to Pursue Mediation was filed by the parties (Doc. 35), which was granted by this Court on July 10. (Doc. 37). The parties informed the Court that a settlement agreement had been reached through a letter filed electronically on the docket, dated September 25, 2015. (Doc. 45). An unopposed Motion for Preliminary Approval of Collective and Class Action

Settlement (Doc. 46) containing the settlement agreement as an attached exhibit

(Doc. 46-1) (the "Agreement") was granted on November 2, 2015.  (Doc. 48).  The

Order also appointed Haught, along with Plaintiffs Justin Lamm, Jimmy Gibbs,

Terry Dinkelman, Clovis Rushing, and Jeannie Rushing,  as class representatives,

and appointed Joseph H. Chivers of the Employment Rights Group and John R.

Linkosky of John Linkosky & Associates as Class Counsel.  As noted above, on

February 24, 2016, Haught filed an unopposed Motion for Final Approval of Class

and Collective Action Settlement, and Approval of Attorneys' Fees and Costs,

(Doc. 51), as well as a Brief in Support of the Motion, (Doc. 53).  A fairness

hearing was held in this matter on March 15, 2016.  For the following reasons, the

Motion shall be granted.

## II.    DISCUSSION

### A.    Class Certification

To establish a class action, a case "must satisfy the four requirements of

Rule 23(a) and the requirements of either Rule 23(b)(1), (2) or (3)." *Marcus v.

BMW of North America, LLC*, 687 F.3d 583, 590 (3d Cir. 2012).  The party

seeking the class certification bears the burden of establishing each element of the

class certification rule by a preponderance of the evidence.  Actual, and not

presumed, conformity with the rule requirements is essential. *Id*. at 591.  "Before

approving the settlement of a class action, a district court must certify that the

settlement comports with Rule 23 and is 'fair, reasonable and adequate.'"

*Rodriguez v. National City Bank*, 726 F.3d 372, 382 (3d Cir. 2013) (quoting FED.

R. CIV. P. 23(e)).  To satisfy Rule 23 (a).

> (1) the class must be "so numerous that joinder of all members is impracticable (numerosity); (2) there must be questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class (typicality); and (4) the named plaintiffs must fairly and adequately protect the interests of the class (adequacy of representation, or simply adequacy).

*Marcus*, 687 F.3d at 590-91 (internal quotations and citations omitted).

In the instant case, the Plaintiffs seek final class certification of the proposed PMWA Settlement Class (all individuals who worked for Summit in Pennsylvania as a Right of Way Agent and were paid a day rate during the class period as set out by the Agreement) and the proposed FLSA Settlement Class (all individuals who worked for Summit as a Right of Way Agent and were paid a day rate during the class period as set out by the Agreement).  (Doc. 46-1, ¶1(n), (z)).  We begin with a consideration of numerosity.  The class size here is 226, (Doc. 53, p. 4), which exceeds the typical numerosity requirement, usually satisfied when "the potential number of plaintiffs exceeds forty." *Id*. at 595.  Thus, the class is sufficiently numerous to warrant certification.

Next we consider the requirement of commonality.  "A putative class satisfies Rule 23(a)'s commonality requirement if 'the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.'

*Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). . . .  [T]hat bar is not a high

one."  *Rodriguez*, 726 F.3d at 382.  "There may be legal and factual difference

among members of a class, as long as all were subjected to the same harmful

conduct by the defendant."  *Id*. at 383.  Here, all Plaintiffs, including the named

Plaintiffs and the prospective class members, performed materially the same duties

and responsibilities.  (Doc. 53, p. 5).  They all allege the same injury – that they

were misclassified as exempted from overtime requirements, and thus that they did

not receive overtime wages.  (*Id*.).  Thus, they share common questions of law and

fact that would determine their ability to receive the remedy uniformily requested,

in this case the repayment of lost overtime wages.

The third 23(a) requirement is typicality.  "Typicality . . . derives its

independent legal significance from its ability to screen out class actions in which

the legal or factual position of the representatives is markedly different from that of

other members of the class even though common issues of law or fact are present."

*Marcus*, 687 F.3d at 598.  The briefs and testimony heard at the fairness hearing

have not indicated that any class members exist who are situated in a way that is

markedly different from the class representatives.  Rather, the Complaint alleges

that a company-wide policy was defective, which thus impacted all the class

members in the same way, as they all have the same compensation structure.  Thus,

the typicality requirement is met.

The last 23(a) requirement is adequacy.  The Court must consider whether the class representatives and class counsel will fairly and adequately protect the interests of the class. To be an adequate representative, "(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir.1975). Defendants have not contested this point (nor have they contested any other) and there appears no reason to find that Plaintiff's interests are antagonistic to those of the potential class or that Plaintiff's counsel is unqualified.  Plaintiffs are represented by counsel with considerable experience litigating class action wage-and-hour lawsuits, and later negotiated a settlement that has met with no objections from the class.  (Doc. 53, pp. 8-9).  Thus, there is no reason to find that Plaintiff and Plaintiff's counsel have not adequately represented the class.

"If the Rule 23(a) requirements are met, then a court must consider whether the class fits within one of the three categories of class actions set forth in Rule 23(b)."  *In Re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 392 (3d Cir. 2015).   In this case, Plaintiff proposes that the class fits within Rule 23(b)(3), a category that requires the Court to determine whether "the questions or law of fact common to the class members predominate over any questions affecting only individual members" and whether "a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy." FED. R.

CIV. P. 23(b)(3).  The predominance requirement "tests whether proposed classes

are sufficiently cohesive to warrant adjudication by representation." *Amchem*

*Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689

(1997).  This standard is "far more demanding than the commonality requirement

of Rule 23(a), requiring more than a common claim."  *In re Hydrogen Peroxide*

*Antitrust Litigation,* 552 F.3d 305, 311 (3d Cir.2008) (internal citations omitted).

"Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's

'close look' at the predominance and superiority criteria."  *Amchem*, 521 U.S. at

615-16 (citing FED. R. CIV. P. 23(b)(3)).  These include:

> (A) the interest of members of the class in individually controlling the
> prosecution or defense of separate actions; (B) the extent and nature of any
> litigation concerning the controversy already commenced by or against
> members of the class; (C) the desirability or undesirability of concentrating
> the litigation of the claims in the particular forum; (D) the difficulties likely
> to be encountered in the management of a class action.

*Id.*  The "nature of the evidence ... determines whether the question is common or

individual." *In re Hydrogen Peroxide*, 552F.3d at 311 (citing *Blades v. Monsanto*

*Co.,* 400 F.3d 562, 566 (8th Cir.2005)).  "If proof of the essential elements of the

cause of action requires individual treatment, then class certification is unsuitable."

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 172 (3d

Cir.2001).  If common issues to determine liability predominate, class certification

is appropriate even if damages must still be proven individually.  *See Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985).

Here, we emphasize that that only Right of Way Agents who have worked for a day rate constitute members of the proposed class.  (Doc. 53, p. 9).  Right of Way Agents who worked for an hourly rate plus overtime are excluded.  Thus, each Agent who is a member of the proposed class is similarly situated and none requires individual treatment to determine the Defendant's liability.  Rather, as the Third Circuit in *Newton* emphasized, this class is prime for certification because the essential elements of each class members' claim are identical and proving them as to one would extend to all.

Though the damages calculation will require individual treatment because some Agents may not have worked as frequently or for as many weeks as others,[1] this alone does not defeat class certification.  Importantly, the Agreement provides that all class members' damages awards will be calculated in the same way, and the only differentiating factor will be the number of hours that each worked.  Further, without a class action in the instant case, individual plaintiffs' damages amounts could be so small as to render separate suits impracticable.  *See Amchem,*

---

[1] "The settlement award for each individual member of the FLSA Settlement Class and the PMWA Settlement Class shall be calculated *pro rata* based on the number of weeks the individual member worked for Summit on a day rate during the relevant time period.  In addition, to account for the allegedly increased number of overtime hours allegedly worked during construction phases of Summit projects, a multiplier of 1.2 will be applied to all workweeks performed on projects containing a significant construction component."  (Doc. 46-1, ¶ 16).

521 U.S. at 616 (noting that any interests of individuals in conducting separate lawsuits "may be theoretic rather than practical" where "the amounts at stake for individuals may be so small that separate suits would be impracticable."). Thus, we find that, like the requirements of Rule 23(a), the predominance and superiority requirements pursuant to Rule 23(b)(3) are met and class certification is appropriate for purposes of effectuating the proposed settlement.

### B.    Fairness of the Class Action Settlement

Pursuant to the Agreement, the parties have proposed that the settlement award will be calculated for each individual member as set forth in footnote 2, and is not to exceed a maximum total amount of $500,000.  As litigation costs, attorneys' fees, and the proposed enhancement award for named class representatives are also to be paid out of the total of $500,000, this leaves a maximum of $325,000[2] for the individual class members' damages and for payment of payroll taxes on the wage portion of the settlement award.

> [W]here settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously, we require district courts to be even "more scrupulous than usual" when examining the fairness of the proposed settlement.  This heightened standard is intended to ensure that class counsel has engaged in sustained advocacy throughout the course of the proceedings, particularly in settlement negotiations, and has protected the interests of all class members.

---

[2] As discussed in further detail below, the parties have proposed a $10,000 payment for litigation costs, $150,000 for attorneys' fees, and a total of $15,000 for the enhancement award.  These costs, deducted from the maximum payment of $500,000, provide the difference of $325,000 which makes up the settlement award.

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004) (citing *In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283, 317 (3d Cir. 1998).  Factors relevant to the Court's consideration of the fairness of a settlement include:

1. The complexity, expense, and likely duration of the litigation;
2. The reaction of the class to the settlement;
3. The stage of the proceedings and the amount of discovery completed;
4. The risks of establishing liability;
5. The risks of establishing damages;
6. The risks of maintaining the class action through trial;
7. The ability of the defendants to withstand a greater judgment;
8. The range of reasonableness of the settlement fund in light of the best possible recovery; and
9. The range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 158 (3d Cir. 1975).  Plaintiff's brief indicates that the parties have agreed that all nine factors weight in favor of a finding that the settlement is fair.  There are no objectors to the settlement terms or amount.  However, in "[a]cting as a fiduciary responsible for protecting the rights of absent class members, the Court is required to 'independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished.'"  *Hegab v. Family Dollar Stores, Inc.*, Civ. A. No. 11-1206(CC), 2015 WL 1021130, at *5 (D. N.J., Mar. 9, 2015) (quoting *In re Cendant Corp. Litig.,* 264 F.3d 201, 231 (3d Cir.

2001).  Our own review, laid out below, indicates that the settlement award is fair,

and thus, we shall approve it.

### i.  The complexity, expense, and likely duration of the litigation

If this case were to proceed to trial, both parties would incur substantially

greater attorneys' fees and litigation expenses.  Discovery disputes, the briefing of

dispositive issues, and a motion to certify the class, prepare for and complete trial,

would all absorb additional time and resources of the parties.  Further, given the

size of the class, these issues would likely be magnified.  The parties have also

indicated a high likelihood of appeal by one or both parties, dependent of course on

the outcome of the case.  As a result of these concerns, this factor weights in favor

of approval of the settlement, which would provide immediate and significant

benefits to the settlement class.  *See Hegab*, 2015 WL 1021130, at *5 (noting that

where a settlement provides "immediate and substantial benefits for the settlement

class," and continued litigation would be lengthy and expensive, the first *Girsh*

factor weighs in favor of settlement).

### ii.  The reaction of the class to the settlement

The second Girsh factor "attempts to gauge whether members of the class

support the settlement."  *In re Prudential Ins. Co. America Sales Practice*

*Litigation Agent Actions*, 148 F.3d 283, 318 (3d Cir. 1998) (citing *Bell Atlantic*

*Corp. v. Bolger*, 2 F.3d 1304, 1313 n. 15 (3d Cir. 1993)).  Here, there has not been

a single objection to the settlement and no class member has requested exclusion.

Thus, this factor also weighs in favor of approval of the settlement.

### iii.   The stage of the proceedings and the amount of discovery completed

In order for a settlement to be considered fair, the parties must demonstrate

"'an adequate appreciation of the merits of the case before negotiating.' *In re*

*General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55

F.3d 768, 813 (3d Cir. 1995)).  To ensure that a proposed settlement is the product

of informed negotiations, there should be an inquiry into the type and amount of

discovery the parties have undertaken." *In re Prudential*, 148 F.3d at 319.  Here,

the parties submit that they have exchanged thousands of documents in the course

of discovery, and that they were fully informed by formal and informal testimony

of more than twenty members of the putative class.  (Doc. 53, p. 13).  Further, they

conducted a "detailed damages analysis based on Summit's payroll records" to

determine the likelihood that Plaintiffs' claims could prevail.  (*Id.*).  This

information, as well as a detailed legal analysis of the risks of further litigation for

both parties led both to the conclusion that negotiations were prudent and a

settlement proper.  (*Id.*).  As such, we see no reason to suspect that the parties

lacked adequate understanding of the merits of their respective positions before

entering into negotiations.  We thus find that this factor also points in favor of

approval of the settlement.

### iv.   The risks of establishing liability and damages

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." ***In re Prudential***, 148 F.3d at 319.  "However, in doing so, a court need not conduct a 'mini-trial and must, to a certain extent, give credence to the estimation of the probability of success proffered by class counsel.'" *Varacallo v. Massachusetts Mut. Life Ins. Co*., 226 F.R.D. 207, 238 (D.N.J. 2005) (citing *In re Ikon Office Solutions, Inc. Sec. Litig.*, 166, 181 (E.D. Pa. 2000)).  Here, the parties have assured the Court that

> Plaintiffs face significant risks if they proceed to trial. . . .  For example, this case has not been certified as a class action, and while Plaintiffs and their counsel strongly believe class certification is warranted, Summit believes just as strongly that when the particular facts of this case are applied to the law, certification should be denied.  Moreover, Summit continues to believe that the Class Members are exempt and therefore not entitled to overtime . . .

(Doc. 53, p. 14).  These risks, if materialized, obviously translate into an outcome where the Plaintiffs would be entitled to receive nothing.  In weighing these potential outcomes against the immediate and definite settlement the class would enjoy, it is clear that this factor too weighs in favor of the Court's approval of the proposed settlement.

### v.    The risks of maintaining the class action through trial

'"Because the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action, this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial."' *Hegab*, 2015 WL 1021130, at *8 (quoting *In re Warfarin Sodum Antitrust Litig*., 391 F.3d 516, 537 (3d Cir. 2004). "Under Rule 23, a district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable." *In re Prudential*, 148 F.3d at 321. It is possible that Plaintiffs' proposed class of 226 would prompt such an outcome. Further, as the Court has already made clear, the Court's decision to certify the proposed class is for purposes of effectuating the settlement only. Summit may oppose any other attempt by the Plaintiffs to certify a class. As such, there is a significant risk of decertification at a later stage in the litigation, which weighs in favor of approving the settlement. *See Varacallo*, 226 F.R.D. at 239 (finding that a risk of decertification weighs in favor of settlement).

### vi.    The ability of Summit to withstand greater judgment

This *Girsh* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement." *In re Warfarin*, 391 F.3d at 537-38 (internal quotations and citations omitted). As noted above, the total value of the proposed settlement is not to exceed $500,000.

Without additional information concerning the state of Summit's finances, the

Court has no reason to believe that Summit would be unable to withstand a larger

judgment against them.  Indeed, in the remarkably thorough briefing on this issue,

Summit's ability to withstand greater judgment is one point that seems to be

unaddressed by the parties, though generally they have concurred that all nine

*Girsh* factors weigh in favor of settlement approval.  However, we find that this

factor weighs neither for nor against approval of the proposed settlement.

### vii. The range of reasonableness of the settlement fund in light of the best possible recovery and all the attendant risks of litigation

The last two *Girsh* factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial.  In order to assess the reasonableness of a proposed settlement seeking monetary relief, "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.

*In re Prudential*, 148 F.3d at 322 (quoting *G.M. Trucks,* 55 F.3d at 806)).  As in

the lower court's holding in *In re Prudential*, to calculate the best possible

settlement for Plaintiffs would be "exceedingly speculative," particularly given

discounts due to increased attorneys' fees, the inherent risks of litigation and

Summit's propositions regarding the attenuation of Plaintiffs' claims.  *Id.*

Plaintiffs' counsel has been outstandingly candid regarding these risks, and has

emphasized that "[c]ounsel are not reluctant to litigate these types of class actions,

and the decision to settle this . . . lawsuit was made after careful consideration of

the risks of litigating the case." (Doc. 53, p. 12). Further, the fact that not a single

class member has opted out or objected to the settlement is significant. We are

thus persuaded that the final two *Girsh* factors weigh in favor of settlement

approval.

This concludes our analysis of the nine *Girsh* factors. Eight of the nine

factors weigh in favor of approving the proposed settlement, and the ninth factor

(the ability of Summit to withstand a greater judgment) is not persuasive in either

direction. As such, we find that the vast majority of the factors weigh in favor of

approval of the proposed settlement, and that our approval is therefore warranted.

## C.     Enhancement Awards

The parties' proposed settlement agreement provides for a total of $15,000

in enhancement awards for the class representatives. (Doc. 46-1, p. 12). This

amount is to be divided, with $5,000 to Plaintiff Haught, $3,500 each to Plaintiffs

Lamm and Gibbs, and $1,000 each to Plaintiffs Dinkleman, Clovis Rushing and

Jeannie Rushing. "Courts routinely approve incentive awards to compensate

named plaintiffs for the services they provided and the risks they incurred during

the course of the class action litigation." *Hegab v. Family Dollar Stores, Inc.*,

2015 WL 1021130, at *16 (internal quotations and citations omitted) (approving an

enhancement award of $7,500 to the named plaintiff). "'An incentive payment to

come from the attorneys' fees awarded to plaintiff's counsel need not be subject to

intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected.'"  *Varacallo*, 226 F.R.D. at 257 (quoting *In re Cendant Corp. Derivative Action Litig.*, 232 F.Supp.2d 327, 344 (D.N.J. 2002)).  However, where an enhancement award would be paid solely from the settlement fund, thereby depleting the financial resources of the class members, a court "carefully reviews this request to ensure its fairness to the class."  *Id.*  Such is the case here.

A thorough history exists on the approval of enhancement awards.  In *Varacallo*, the District Court for the District of New Jersey amply detailed this history, in which courts approved enhancement awards ranging from $1,000 to $50,000.  *Id.* at *257-58 (approving $10,000 enhancement awards for five named plaintiffs, and $3,000 and $1,000 awards for two others).  However, "incentive awards will not be freely distributed without a substantial basis to demonstrate that the individual provided services for the Class and incurred risks during the course of the litigation."  *Id.* at 258.

Here, parties explain that the named Plaintiffs have been involved, to varying degrees, in the class action.  Their time and efforts have been "integral to Plaintiffs' successfully reaching a settlement."  (Doc. 53, p. 17).  Specifically, Plaintiff Haught initiated the lawsuit, and Plaintiffs Haught and Lamm both submitted declarations in support of the Plaintiffs' Motion for conditional certification.  (*Id.*).  Plaintiffs Haught, Lamm, and Gibbs each responded to

"extensive" written interrogatories and requests for documents, and Plaintiffs Dinkleman and Clovis and Jeannie Rushing provided extensive informal testimony and made themselves available for numerous calls from Class Counsel. (*Id.*).

Further, the proposed enhancement awards do not fall outside of those awards previously approved by courts in similar cases. Given the efforts and time expounded by the named Plaintiffs, the importance of their efforts to the success of the suit, and the relative modesty of the requested enhancement awards, the Court finds that Plaintiffs are entitled to their requests.

### D.    Attorneys' Fees

Rule 23(h) provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." "The awarding of fees is within the discretion of the Court, so long as the Court employs the proper legal standards, follows the proper procedures, and makes findings of fact that are not clearly erroneous." *Hegab*, 2015 WL 1021130, at *10 (citing *In re Cendant Corp. PRIDES Litig.,* 243 F.3d 722, 727 (3d Cir.2001)). In the instant case, Defendant agrees to pay a maximum class counsel award of $160,000, consisting of $150,000 in attorneys' fees and $10,000 in litigation costs.

"Relevant law evidences two basic methods for evaluating the reasonableness of a particular attorneys' fee request—the lodestar approach and the

percentage-of-recovery approach." *Id.* at *11 (internal quotation marks and citation omitted). "The lodestar method is generally applied in statutory fee shifting cases and 'is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation.'" *Id.* (citing *In re Cendant Corp.,* 243 F.3d at 732). The lodestar is also preferable where "the nature of the settlement evades the precise evaluation needed for the percentage of recovery method." *In re Gen. Motors,* 55 F.3d at 821; *see also In re Rite Aid Corp. Securities Litig.,* 396 F.3d 294, 300 (3d Cir. 2005). However, "[t]he percentage-of-recovery method is preferred in common fund cases, as courts have determined 'that Class Members would be unjustly enriched if they did not adequately compensate counsel responsible for generating the fund.'" *Hegab*, 2015 WL 1021130, at *11 (quoting *Varacallo,* 226 F.R.D. at 249 (internal quotation marks and citation omitted). The Court has discretion to decide which method to employ.

The instant case represents a scenario in which the percentage-of-recovery method is preferable to evaluate the reasonableness of the attorneys' fee request. There is a clearly delineated common fund which lends itself well to valuation. The fund is also not so small that a percentage-of-recovery method would not be sufficient to compensate Plaintiffs' attorneys. Further, the percentage-of-recovery

method has functioned here to incentivize counsel to obtain the maximum possible recovery in the shortest time possible given the circumstances, as it is meant to do. *See Varacallo,* 226 F.R.D. at 249. Thus, we shall proceed under the percentage-of-recovery method.

Known as the Gunter/Prudential factors, there are ten factors that the Third Circuit has identified in considering whether an attorneys' fee award is reasonable under the percentage-of-recovery method. These are:

1.  The size of the fund and the number of persons benefited;
2.  Whether members of the class have raised substantial objections to the settlement terms or fee proposal;
3.  The skill and efficiency of the attorneys involved;
4.  The complexity and duration of the litigation;
5.  The risk of nonpayment;
6.  The amount of time devoted to the case by Plaintiffs' counsel;
7.  The fee awards in similar cases;
8.  The value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations;
9.  The percentage fee that would be been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained;
10. Any innovative terms of settlement.

*In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009). "Trial courts must 'engage in a robust assessment of the [Gunter/Prudential] factors when evaluating a fee request.'" *Id.* (quoting *In re Rite Aid*, 396 F.3d at 302). "'Determining an appropriate award, however, is not an exact science.'" *Varacallo*, 226 F.R.D. at

*248 (internal citation omitted).  With this guidance in mind, we consider each

factor in turn.

###### i.        The size of the fund and number of persons benefited

"In considering the size of the expected recovery under the proposed

settlement, . . . percentage awards generally decrease as the amount of the recovery

increases. . . .   The basis for this inverse relationship is the belief that '[i]n many

instances the increase [in recovery] is merely a factor of the size of the class and

has no direct relationship to the efforts of counsel.'"  *In re Prudential*, 148 F.3d at

*339 (quoting *In re First Fidelity Bancorporation Securities Litigation,* 750

F.Supp. 160, 164 n. 1 (D.N.J.1990)).  As already noted, the class size is 226 and

the size of the fund is $500,000, minus attorneys' fees, litigation costs and

enhancement awards.  Thus, the total amount of recovery is relatively small, so no

compensatory decrease in the percentage of the award is needed, *see Erie Cnty.*

*Retirees Ass'n v. Cnty. of Erie*, 192 F.Supp.2d 369, 381 (W.D.Pa. 2002)

(explaining that in class-action settlements worth millions of dollars, the attorneys;

fees are often limited to 25% of the settlement value "in order to prevent a windfall

to counsel"), and attorneys are not at risk of receiving a windfall.  Further, each

class member entitled to receive an average of $1,400[3] and up to $4,409.08,[4] an

---

[3] This figure was calculated by taking the $500,000 maximum settlement amount, subtracting the attorneys' fees, litigation costs and enhancement awards, and then dividing the remaining $325,000 by the 226 class members.
[4] This figure was supplied by Plaintiffs Brief, Doc. 53, p. 23.

amount which falls squarely within the range of per person amounts approved by other wage-and-hour cases. *See Hegab*, 2015 WL 1021130, at \*12 (finding that a gross amount per person of $2000 was reasonable, and noting other cases approving $1,561 per person and $1,771 per person gross amounts). Thus, this factor counsels in favor of approving the proposed attorneys' fees.

### ii.   Whether members of the class have raised substantial objections to the settlement terms or fee proposal

As already discussed in our consideration of the *Girsh* factors, the members of the class have not raised a single objection to any portion of the settlement agreement, including the settlement terms or the fee proposal. Though not overly significant, this absence nonetheless causes this factor to weigh in favor of approval of the requested attorneys' fees. *See Erie Cnty.*, 192 F.Supp.2d at 379 ("Given the complexity of the analysis with respect to the attorneys' fees request, we will afford some, albeit not significant, weight to the lack of objections.").

### iii.   The skill and efficiency of the attorneys involved

As noted above, class counsel are skilled and experienced litigators who have represented numerous clients in FLSA and PMWA litigation before. Further, they worked quickly and efficiently in the instant case to negotiate a settlement within nine months of filing Plaintiffs' Complaint. The class members will receive their individual settlements within eighteen months of the date on which the Complaint was filed, a very efficient timeline given the complexity of this type of

litigation.  Thus, this factor also weighs in favor of approving the requested attorneys' fees.  *See Hegab*, 2015 WL 1021130, at *12 ("[C]lass counsel are experienced in litigating and settling consumer class actions.  Class counsel obtained substantial benefits for the class members— . . .a consideration that further evidences class counsels' competence.  Thus, this factor also weighs in favor of approval of the fee award.").

### iv.    The complexity and duration of the litigation

To date, this case has not stretched on overlong.  However, it is not clear that it could be quickly or easily resolved should it proceed to the trial stage.  As noted in our consideration of the *Girsh* factors, both parties have indicated the strength of their arguments and their willingness to appeal the outcome of trial should they be unsatisfied with the result.  This, combined with the uncertainty and complexity of the legal issues presented, *see Brumley v. Camin Cargo Control, Inc*., 2012 WL 1019337, at *11 ("FLSA claims and wage-and-hour law enforcement through litigation has been found to be complex by the Supreme Court and lower courts"), indicates that this factor also weighs in favor of approval of the attorneys' fees.

### v.    The risk of nonpayment

The parties emphasize that Summit is involved in the oil and gas industry, and as such, is always subject to the whims of a fluctuating market.  Though there has been no indication that Summit would be unable to satisfy an unfavorable

judgment or pay Plaintiffs' attorneys' fees at a later date, Plaintiffs believe it is

prudent to consider the risks of a volatile economy when weighing the value of a

timely settlement and prompt payment.  (Doc. 53, p. 24).  Indeed, courts have

noted that where plaintiffs' counsel faces a risk of nonpayment or lesser payment

should the case proceed to the trial phase, that risk should be considered when

assessing attorneys' fee awards.  *See Gunter v. Ridgewood Energy Corp.*, 223 F.3d

190, 199 (3d Cir. 2000) ("[T]he risk that counsel takes in prosecuting a client's

case should also be considered when assessing a fee award.").  Further, as

continually noted, the Plaintiffs have indicated that though they believe a favorable

outcome is merited, it is by no means a certainty.  Thus, though by no means

unusual, Plaintiffs' counsel took on a risk by litigating a case with an uncertain

outcome.  As such, this factor weighs in favor of approving the proposed attorneys'

fees.

> **vi.    The amount of time devoted to the case by Plaintiffs'
> counsel**

Plaintiffs' counsel submits that they have spent 436.25 hours working on

Plaintiffs' case over the last year.  Much of this time was spent in the preparation

of an extensive analysis of the likely damages in this case, for use during the

mediation.  Ultimately, Plaintiffs' counsel also attended a 14-hour mediation

session spanning over two days, and negotiated for the best possible result for the

class members.  (Doc. 53, p. 24).  The amount of time Plaintiffs' counsel devoted

to the case is thus in line with that which other courts have found to favor approval of proposed fee awards.  *See Hegab*, 2015 WL 1021130, at *13 (finding that over 1,000 hours of contingent work over the course of three years weighed in favor of approval).  We arrive at the same conclusion and find that this factor too supports approval of the fee award.

### vii.    The fee awards in similar cases

"There is no consensus on what percentage of a common fund is reasonable, although several courts in this circuit have observed that percentage of recovery fee awards generally range from 19% to 45%, with 25% being typical." *Erie Cnty.*, 192 F.Supp.2d at 378 (approving a fee award of 38% of the total fund). "Fee awards ranging from thirty to forty-three percent have been awarded in cases with funds ranging from $400,000 to $6.5 million, funds which are comparatively smaller than many." *Id*. at 381.  Here, we have a requested attorneys' fee award that constitutes 30% of the total fund.  This is well within the range of fees awarded in cases with similarly small settlements (as compared to the multi-million dollar settlements that often cause courts to reduce the fee award percentage to avoid a "windfall," as discussed above).

Further, in comparing this case to a similar overtime wage case, *Hegab v. Family Dollar Stores*, we also find the fee award to be reasonable.  In *Hegab*, a fee award of $345,000, paid from a total award of $1.15 million was approved by the

court.  This also represented 30% of the total fund.  Thus, the factor concerning fee awards in similar cases lead us to conclude that this analysis also weighs in favor of approving the fee request.

> ### viii.   The value of benefits attributable to the efforts of class counsel, relative to the efforts of other groups

This factor seeks to compare the actions of government prosecutions, similar private cases, and agency litigation to the instant private litigation.  *See In re Diet Drugs*, 582 F.3d 524, 544 (3d Cir. 2009) (discussing "the typical antitrust or securities litigation – in which the Gunter/Prudential factors are often considered – where government prosecutions frequently lay the groundwork for private litigation.").  In *In re Diet Drugs*, the Third Circuit explains that comparing their case to other similar cases can give plaintiffs' counsel a "litigation roadmap" such that their work is less arduous.  *Id*.  *In re Diet Drugs* addressed this factor in the context of another case being litigated in Texas against the same defendant, Wyeth, which preceded that of the Third Circuit plaintiffs.  *Id*. (noting the "contributions of lawyers who, while conducting contemporaneous diet drugs litigation in Texas state courts, obtained millions of pages of discovery from Wyeth and took 43 depositions before a single deposition took place in the MDL.").  Here, however, there is no such preceding case against Summit.  While other wage-and-hour lawsuits have surely existed, none have been so closely related to these parties that they would detract greatly from the burden of work that Plaintiffs' counsel had to

shoulder.  Plaintiffs' counsel has reported that the instant case was not simple, but "required a large number of witness interviews and several depositions, and if the case were to continue those numbers would increase many-fold."  (Doc. 53, p. 23-24).

There is also no readily comparable government agency or other group with which to compare the value of the benefits attributable to Plaintiffs' counsel.  In this way, this case also differs from the typical antitrust or securities litigation that this factor is more suited to analyze.  Thus, in an abundance of caution, we conclude that this factor neither weighs for nor against approval of the requested fee award.

### ix.    The percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement

This analysis requires the Court to consider "whether the requested fee is consistent with a privately negotiated contingent fee in the marketplace. 'The percentage-of-the-fund method of awarding attorneys' fees in class actions should approximate the fee [that] would be negotiated if the lawyer were offering his or her services in the private marketplace.'"  *Hegab*, 2015 WL 1021130, at *14 (quoting *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013, *44-45, 2005 WL 1362974).  Here, Plaintiffs' counsel submits a lodestar amount that is consistent with an average of their standard hourly rates, as they would exist in the private marketplace.  This amount comes to a total of

$162,842.75, and would have amounted to approximately a one-third, or 33%

private contingency fee. As this is actually a greater amount than that which

Plaintiffs' counsel are currently requesting, we find that this factor also points in

favor of approval of the proposed fee award.

### x.   Innovative terms of settlement

In certain cases, a district court may find that "class counsels' representation

and the results achieved [by the settlement agreement] were 'nothing short of

remarkable.'"   *See In re Prudential*, 148 F.3d 283, 339.   Particularly where a

settlement involved "innovative" or unique terms, such a finding may be

warranted.   *Id.* (describing the findings of the lower court regarding plaintiffs'

counsels' work on the settlement, including "the availability of full compensatory

relief, the extensive and comprehensive outreach, and the multi-tiered review

process designed to ensure fair scoring of claims," among other characteristics).

While we commend Plaintiffs' counsel for their diligent and efficient work on this

suit and in reaching the proposed settlement, there is no indication that a departure

in favor of a larger fee award is merited on this basis.

Thus concludes our analysis of the ten fee award reasonableness factors.

"The fee award reasonableness factors 'need not be applied in a formulaic way'

because each case is different, 'and in certain cases, one factor may outweigh the

rest.'"   *In re Diet Drugs*, 582 F.3d at 545 (quoting *In re AT & T Corp.,* 455 F.3d

160, 166 (3d Cir. 2006)).  Here, we determine that the vast majority of the factors

weigh in favor of approving the proposed fee award, and that any remaining

factors are neutral, and so do not weigh against such approval.  Therefore, we hold

that the requested fee award is fair and reasonable under the percentage-of-

recovery method.  We now turn to the lodestar cross check.

### xi.    Lodestar Analysis

"[I]t is sensible for a court to use a second method of fee approval to cross

check its conclusion under the first method. . . ."  In re General Motors, 55 F.3d

768, 820-21 (3d Cir. 1995).  Thus, we turn to the lodestar method to ensure that

our initial analysis under the percentage-of-recovery method was correct.  In its

own cross check, the district court in *Hegab* provided a detailed explanation of the

lodestar calculation.

> The lodestar analysis is performed by "multiplying the number of hours
> reasonably worked on a client's case by a reasonable hourly billing rate for
> such services based on the given geographical area, the nature of the services
> provided, and the experience of the attorneys."  *In re Rite Aid,* 396 F.3d at
> 305: *see also In re Diet Drugs Prod. Liab. Litig.,* 582 F.3d 524, 540 (3d
> Cir.2009).  When performing this analysis, the Court "should apply blended
> billing rates that approximate the fee structure of all the attorneys who
> worked on the matter."  *In re Rite Aid.* 396 F.3d at 306.  The lodestar figure
> is presumptively reasonable when it is calculated using a reasonable hourly
> rate and a reasonable number of hours.  *Planned Parenthood of Cent. N.J. v.
> Att'y Gen. of N.J.,* 297 F.3d 253, 265 n. 5 (3d Cir.2002) (citations omitted).
> After calculating the lodestar amount, the Court may increase or decrease
> the amount using the lodestar multiplier.  The multiplier is calculated by
> dividing the requested fee by the lodestar figure.  "The multiplier is a device
> that attempts to account for the contingent nature or risk involved in a

particular case and the quality of the attorneys' work." *In re Rite Aid.* 396
F.3d at 305–06

*Hegab*, 2015 WL 1021130, at *14-15.

We thus begin by considering the lodestar figure.  Plaintiffs' counsel has

provided an amount of $162,842.75.  As noted above, the representations of

Plaintiffs' counsel indicate that counsel spent 436.25 hours on the case, including

time billed by paralegals.[5]  (Doc. 53, p. 26).  Counsels' hourly rates include

$525/hour for senior attorneys, $375 per hour for a junior attorney, and $125 per

hour for a paralegal.  While the Plaintiffs' brief does not provide the "blended" rate

that the attorneys used to calculate their overall lodestar amount of $162,842.75,

when this amount is divided by the hours worked, the rate used appears to be

approximately $373.28 per hour, which is reasonable given all of the rates charged

and the rates typical for this geographic region given the experience of the

attorneys involved.  Thus, the lodestar figure is presumptively reasonable.

We next calculate the multiplier.  The requested attorneys' fee is $150,000,

which, when compared to the lodestar amount, indicates that the result is a

negative lodestar multiplier of .92.  A negative lodestar multiplier is thus "below

the range found to be acceptable by the Third Circuit."  *Hegab*, 2015 WL 1021130,

at *15 (citing *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 734, 742 (3d Cir.

---

[5] As indicated above, our analysis of comparative case law has already shown this is a reasonable
amount of time as compared to time spent on cases of a similar nature and the complexity of the
matters involved.

2001) (approving a suggested multiplier of three and stating that multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied"). Thus, because the lodestar amount is more than the requested attorneys' fee award, the multiplier indicates that the award is reasonable on its face. Therefore, through the above conducted percentage-of-recovery method, and the lodestar cross check, this Court concludes that the requested attorneys' fee is fair and adequate.

### E.   Litigation Fees

Plaintiffs' counsel seeks $10,000 in litigation fees and expenses to be awarded from the $500,000 settlement fund. Counsel indicates that they have incurred $7,575.67 in costs and expenses as of February 17, 2016 (Doc. 52, ¶ 16), and that the total figure by this point in the litigation is higher. (Doc. 53, p. 20). Specifically, counsel indicates that these $7,575.67 in fees have accrued due to the costs of filing, process server fees, photocopies, postage, and envelope costs. (Doc. 52, ¶ 16). "Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." *Abrams v. Lightolier Inc*., 50 F.3d 1204, 1224-25 (3d Cir. 1995) (noting that there is "no authority for an award of out-of-pocket litigation expense other than a specified list of items"). We find that the $7,575.67 in expenses were adequately documented and were reasonably and

31

appropriately incurred through the course of litigation in this case.  However, as there is no documentation for the additional $2,424.33 that counsel requests, and because this amount would detract from the entirety of the settlement fund, we decline to grant counsels' request for the full $10,000.  Rather, we approve litigation fees in the amount of $7,575.75 at this time and invite counsel to supplement the record with further documentation to support the additional requested costs.  If such documentation is adequately supplied, the Court shall consider allowing for an increase to the amount of costs awarded.

### F.    Notice

Finally, we briefly consider the notice requirement.  Rule 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."  FED. R. CIV. PRO. 23(e). The Court reviewed and approved the parties' proposed notice in its November 2, 2015 Order granting preliminary approval of the Agreement.  (Doc. 48).  In Plaintiffs' Brief, Plaintiffs represent that the notice was subsequently mailed to each of the 226 class members, including the 74 members of the PMWA class. (Doc. 53, p. 12).  The process detailed there, which included further address checks on returned notices, remailing of notice packets, and outreach to those whose notice packets were yet again returned, appears satisfactory and practicable under

the circumstances.  The Court has no reason to conclude that notice was not

adequately provided.

## III.   CONCLUSION

"The law favors settlement, particularly in class actions and other complex

cases where substantial judicial resources can be conserved by avoiding formal

litigation. . . .  These economic gains multiply when settlement also avoids the

costs of litigating class status—often a complex litigation within itself."  *In re Gen.*

*Motors*, 55 F.3d 768, 784 (3d Cir. 1995).  For the foregoing reasons, the settlement

laid out by the Agreement is approved in its entirety, with the exception of a

$2,424.33 reduction in the requested litigation costs, as laid out above.  As noted,

Plaintiff's counsel is advised that they may supplement the record with additional

documentation as to the requested costs, and the Court will consider approving an

enhancement.  A separate order shall issue.